**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**IPHONE FCC ID: BCG-E2816A, IMEI: 354447063081181** | Mag. No. 16-MJ-438 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
UNDER RULE 41 FOR A WARRANT TO SEARCH**

I, Elizabeth Farrell, Special Agent with the Federal Bureau of Investigation (FBI), Northern Virginia Resident Agency of the Washington Field Office (WFO), Washington D.C., (hereinafter the "affiant") being duly sworn, depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for the authorization of the examination and extraction of electronically stored information contained in a cellular telephone. The electronic device (hereinafter **Target Device**) to be searched is described further in the following paragraphs and Attachment A.

2. I am a Special Agent of the FBI assigned to the Northern Virginia Resident Agency of the Washington Field Office. I have been a Special Agent with the FBI since October 2005, and assigned to the Northern Virginia Resident Agency of the Washington Field office since January 2016. I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7). As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I am currently assigned to investigations relating to, among other things, crimes against children, including the production, distribution, and receipt of child pornography, in violation of 18 U.S.C. Sections 2251, 2252, and 2252A. I have gained expertise in the conduct of such investigations through formal training and on-the-job training with more

1

experienced agents. I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, and a variety of other investigative tools available to law enforcement officers. In addition, I have received specialized training in the sexual exploitation of children. In my law enforcement capacity, I have assisted in child pornography investigations.

## BASIS FOR FACTS CONTAINED IN THE AFFIDAVIT

3. Throughout this investigation, law enforcement officers and agents have worked together to collect and record information about the illegal activities of those under investigation. The facts and information contained in this affidavit are based upon my personal knowledge, and information obtained from state and federal law enforcement officers, as well as from your affiant's own review of the communications with the undercover officer and defendant, Michael Bazis.

4. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me, other law enforcement officers, or known to the government. Not every fact known to this investigation or by the government is set forth in this affidavit. Additionally, unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, that statement is described in substance, and in part, and is not intended to be a verbatim recitation of the entire statement.

## IDENTIFICATION OF THE TARGET DEVICE TO BE EXAMINED

5. This affidavit is respectfully submitted in support of a search warrant for Iphone FCC ID: BCG-E2816A, IMEI 354447063081181, belonging to Michael Bazis ("defendant") which was retrieved from the defendant at the time of his arrest in Washington, D.C. on May 31, 2016.

**RELEVANT STATUTES**

6.   This investigation concerns alleged violations of Title 18, United States Code, Sections 2252(a)(4) and 2423(b), relating to material involving the sexual exploitation of minors.

   a.   Title 18, United States Code, Section 2252(a)(4) prohibits the possession of one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been transported in interstate or foreign commerce or that were produced using materials that had traveled in interstate or foreign commerce.

   b.   Title 18, United States Code, Section 2423(b) prohibits the travel in interstate commerce for the purpose of engaging in any illicit sexual conduct with another person.

**RELEVANT DEFINITIONS**

7.   The following definitions apply to this Affidavit:

   a.   IP Address:  The Internet Protocol address (or simply "IP") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer (including smart phone cellular devices) that are attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   b.   The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and

3

international borders, even when the devices communicating with each other are in the same state.

  c. "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any adversary that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

  d. "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

  e. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

  f. "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the

production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

g. "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

h. "Internet Connection" means a connection required for access to the Internet. The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

i. "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

j. "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

k.      "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See 18 U.S.C. § 2256(2).

l.      "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

## FACTS ESTABLISHING PROBABLE CAUSE

8.  The **Target Device** is currently in the lawful possession of the FBI.  The item came into the FBI's possession following the initiation of a criminal investigation involving the defendant's text communications with an undercover officer working with your affiant.   The **Target Device** is currently in storage in the Evidence Control Room at the FBI office in Washington, D.C., a location within the District of Columbia.  In my training and experience, I know that the **Target Device** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Target Device** first came into the possession of the FBI.  For the reasons set forth below, I respectfully submit there is probable cause to believe that evidence of the defendant's intent to travel across state lines for the purpose of engaging in sex with minors, and possession of child pornography, will be located on the **Target Device**.

9.  In April 2016, Special Agent Peter Kaupp was acting in an undercover capacity as part of the Federal Bureau of Investigation ("FBI") Child Exploitation Task Force.  Acting as an undercover officer ("UC"), he posted an online advertisement in a predicated area of the online website for classified advertisements, which, based on the UC's experience and

information gathered from other sources, is an area of the website that is frequented by individuals who have a sexual interest in children and incest. The advertisement was intended to attract individuals with a sexual interest in children through the use of adjectives such as "taboo."

10. On April 20, 2016, an individual, subsequently identified as Michael J. Bazis (defendant), answered the UC's advertisement, stating over email: "Taboo is such a nice, naughty word. I would love to discuss the possibilities. What specifics do you have in mind…I'm serious in my endeavors and won't waste your time." The defendant stated that his name was "Mike." In response, the UC emailed that "we are looking for someone to share a one night stand with," and informed the defendant that the UC has a purported 10-year-old daughter who "loves oral." The defendant asked if the UC's purported 10-year-old daughter has "had vaginal sex" yet, and the UC replied yes. The UC and the defendant then agreed to continue to communicate over KIK, a free texting application for mobile devices. The defendant provided the UC with his KIK username "anicefind."

11. On April 22, 2016, the conversation continued over KIK. The UC told the defendant that he was "[l]ooking to meet with someone with similar interests[,] [s]hare my daughter." The defendant replied, "[s]ounds very interesting," and stated that he has had "experience." The defendant subsequently explained that a few years earlier, he had met a father with a 16-year-old daughter and engaged in sexual acts with her.

12. On April 27, 2016, the UC and the defendant continued to discuss the UC's purported 10-year-old daughter. The UC asked the defendant what he wanted to do with the child, and the defendant replied, "[w]hatever you two are comfortable with[,] [w]hat do you want to see?" The UC responded, "watch her lick and suck your cock….[t]reat her like a slut," and the defendant replied, "[s]ounds good to me…[u]ltimately fuck?" The defendant texted, "I would

7

love to tease her, make her want it." The UC replied, "[y]eah[,] [b]eg on her knees for your cock," and the defendant stated, "I wouldn't deny her request for long…"

13. On April 28, 2016, the UC asked the defendant if he had any "good pics to share," and in response, the defendant sent two images to the UC. The first image was of a girl, approximately 16-18 years old, lying naked on a raft in a pool. She's positioned on her knees, exposing her anus and genitalia. The second image is of a girl, approximately 16-18 years old, wearing only a pair of cut off jean shorts with her breasts exposed.

14. On May 26, 2016, the defendant texted the UC, "Still interested in meeting?" The UC then continued to communicate with the defendant over KIK over the course of the next several days. The UC asked the defendant what ages he was into, and the defendant replied, "All ages." The UC asked the defendant what he was "into," and the defendant replied, "[o]ral, giving, receiving, very open-minded." The UC and the defendant then engaged in the following conversation:

| | |
|---|---|
| UC: | What do you have in mind? |
| Defendant: | Your original post said you were looking for another guy to join you, right? |
| UC: | Yep. |
| Defendant: | I would love that |
| UC: | Still trying to get a sense of who/what you are looking for. I have a lot to risk, want to make sure you're safe |
| Defendant: | I have a lot to risk too. Believe me, I'm very safe and ultra discreet. I'm open to any options/scenarios you have in mind. We talked about meeting for a beer to get acquainted. |
| UC: | Yeah. LOL might be a good idea. Let me know what you want so I know we are meeting for the right reason/same page. |
| Defendant: | To get together with your daughter, right? |
| UC: | Yeah. You know how old she is? |
| Defendant: | Yes…10 |
| UC: | …That's not too young for u?? |
| Defendant: | It'll be the youngest so far. I've done 13. |
| UC: | How long ago was that |
| Defendant: | Last year |
| UC: | How long ago was that |
| Defendant: | Last year |
| UC: | Nice. How do u know her |

| | |
|---|---|
| Defendant: | **Another father from CL** (emphasis added) |
| UC: | You keep in touch with him…what did u do with her |
| Defendant: | Once in awhile.  Oral both ways and fucking too.  Very hot. |
| UC: | Mmm sounds hot |
| Defendant: | Hot and wet! |

15. On May 27, 2016, the UC told the defendant that the UC would have his purported 10-year-old daughter on "Tuesday," that the defendant seemed "real cool…would love to have you meet up with me and my girl," and asked the defendant if he could travel to D.C. on Tuesday, May 31, 2016.  The defendant replied that he "should be able to," and that he "would love to fuck too….She's gotta be very tight…I can provide lube too."

16. On May 30, 2016, the defendant texted, "Still on for tomorrow…Woke up very horny this morning."  The defendant inquired if the UC was "looking for a one-time thing, or something on-going, if possible."  The UC told him "[o]ne time thing but if things go well I would like it to be ongoing."  The defendant replied, "I would like that too.  It would be great."

17. On May 31, 2016, the defendant texted the UC to inquire about what time to meet and the location of the meet.  The UC provided the defendant with these details. At approximately 6:10pm, the defendant arrived at the pre-arranged location and approached the UC.  The defendant reiterated to the UC that he had traveled for the UC's purported 10-year-old daughter.  The defendant stated that he would often search Craigslist advertisements for parents with access to young children.  The defendant explained again that in the past year, he had met a father on Craigslist who had a 13-year-old daughter in the Washington, D.C. area.  The defendant explained that after meeting the father, he had sex with the father's 13-year-old daughter.  In addition, during the course of the conversation between the defendant and the UC, they discussed the possibility of taking photographs of the UC's purported 10-year-old daughter. The UC indicated that he wouldn't want pictures taken of the child's face, and the defendant

stated that was fine because he intended for the pictures to focus on the purported 10-year-old child's genitalia.

18. Thereafter, the defendant was placed under arrest by members of the Child Exploitation Task Force. Search incident to arrest of the defendant's person recovered a bag. Inside the bag was a tube of Astroglide, condoms, and a blue pill that appeared to be Viagra.

19. Also recovered from the defendant's person was an Iphone with FCC BCG-E2816A and IMEI 354447063081181 (the **Target Device**).

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

20. Based on my training and experience, computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet

pages. Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

21. Records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in Attachment B, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

22. Forensic evidence on a cellular phone can also indicate who has used or controlled

the cellular phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the cellular phone at a relevant time.

23. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage media, like cellular phones, that are necessary to draw an accurate conclusion, is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

24. I know that when an individual uses a digital device to display or access information pertaining to sexual activity with children, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of

12

Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

25. ***Methods To Be Used To Search Digital Devices***.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law

enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

    c.    The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises. Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain enormous amounts of data.

    d.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

    e.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data

14

by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

      f.      Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to

secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

      g.      Based on all of the foregoing, I respectfully submit that searching the **Target Device** pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

      h.      In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1. The analysis of the contents of the **Target Device** may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

2. In searching the seized **Target Device**, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## CONCLUSION

26. Based upon these facts, there is probable cause to believe that there are fruits and

evidence of offenses involving violations of Title 18, United States Code, Sections 2252(a)(4) (possession of child pornography) and 2423(b) (travel with intent to engage in illicit sexual conduct), which will be found within the seized cellular phone – such as pertinent communications between the defendant and the UC, communications between the defendant and the father(s) that the defendant stated he met on Craigslist for the purpose of sexually abusing their children, and images of child pornography/child erotica, as further described in Attachments A and Attachments B.

27. I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

                                                  Elizabeth Farrell
                                                  Special Agent
                                                  Federal Bureau of Investigation

Sworn and subscribed before me
this 7th day of June 2016.

_____
United States Magistrate Judge